**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| KELLANOVA,<br><br>Plaintiff,<br><br>v.<br><br>CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND,<br><br>Defendant. | Case No. 24 C 918<br><br>Hon. LaShonda A. Hunt |
| CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND and CHARLES A. WHOBREY, as trustee,<br><br>Plaintiffs,<br><br>v.<br><br>KELLANOVA,<br><br>Defendant. | Case No. 24 C 941<br><br>Hon. LaShonda A. Hunt |

**MEMORANDUM OPINION AND ORDER**

In 2019, Kellanova Company ("Kellanova") ended its participation in a multiemployer pension plan administered by Central States, Southeast and Southwest Areas Pension Fund (the "Fund"). Kellanova and the Fund eventually proceeded to arbitration on two disputed issues. Kellanova argued, first, that the Fund improperly calculated the withdrawal liability it owed to the Fund under the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended by the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), and second, that the Fund violated 29 U.S.C. § 1085(g)(3)(A) when it used post-2014 contribution rate figures to determine the payment schedule for Kellanova's withdrawal liability. The arbitrator resolved the withdrawal liability calculation in the Fund's favor, and the payment schedule in Kellanova's favor.

Kellanova then brought suit in this Court to both enforce and modify the arbitration award. On the same day, the Fund and one of its present trustees filed a separate complaint for the same. The Court subsequently consolidated both cases and ordered all future filings to be made in the lead case (24 C 918) only. (Dkt. 13). Currently before the Court are the parties' cross-motions to enforce in part and modify in part the arbitration award. For the reasons discussed below, the Fund's motion (Dkt. 22) is denied and Kellanova's motion (Dkt. 24) is granted.

## BACKGROUND

### I. Statement of Facts

The parties jointly stipulated to the facts in the underlying arbitration. (Stipulation, Dkt. 20). The Fund is a multiemployer pension plan and Kellanova was a contributing employer to the Fund. (*Id.* at 139).[1] In 2008, the Fund's actuary certified that it was in critical status and added to its plan document an initial Rehabilitation Plan under the Pension Protection Act of 2006 ("PPA"). (*Id.* at 98). A rehabilitation plan may require an employer to, among other things, increase its contributions for the plan to emerge from critical status. *See* 26 U.S.C. § 432(e). The initial version and all amended versions of the Rehabilitation Plan did not change the Fund's standard benefit accrual formula, which provides that a participant's benefit accrual is 1%. (Stipulation at 140).

On December 31, 2012, Kellanova effected a partial withdrawal from the Fund ("2012 Partial Withdrawal"). (*Id.* at 142). As a result, Kellanova incurred withdrawal liability to the Fund that was payable in a lump sum of $3,335,480.58, or via a payment schedule providing for payments of $72,195.71, due on the first day of each month from April 2014 through July 2018, followed by a final payment of $26,343.17, due on August 1, 2018. (*Id.* at 142-143).

[1] Unless otherwise noted, page numbers in citations to the docket reference the "PageID #" in the CM/ECF header of the document, not other page numbers in the header or footer."

Kellanova effected a complete withdrawal from the Fund on July 28, 2019 (the "2019 Complete Withdrawal"). (*Id.* at 141). Consequently, Kellanova incurred withdrawal liability to the Fund that was payable in a lump sum of $330,455,053.41, or 240 monthly payments of $703,421.11. (*Id.*). In determining this payment schedule, the Fund used the highest contribution rate of $234.90 per week, which is the highest contribution rate that Kellanova paid after January 1, 2015, and prior to the 2019 Complete withdrawal. (*Id.* at 1865). Important to the dispute here, the highest pre-2015 contribution rate paid by Kellanova was $208.80. (*Id.* at 755).[2]

The parties offer differing views on how the Fund should have calculated the payment schedule and the 2019 Complete Withdrawal. (*Id.* at 2811). Specifically, the Fund states that it should be able to use post-2014 contribution rate increases in determining the 2019 Withdrawal Liability payment schedule. (*Id.* at 92). On the other hand, Kellanova challenges the Fund's application of the so-called prior partial credit for the 2012 Partial Withdrawal, which is a credit the Fund used to reduce the amount owed for the 2019 Complete Withdrawal under 29 U.S.C. § 1386(b)(1). (*Id.*).

## II. **Procedural History**

Following arbitration of these issues, the arbitrator found "the post-2014 contribution rate increases cannot be included in the highest contribution rate used to determine the Company's withdrawal liability" under 29 U.S.C. § 1085(g)(3)(A). (*Id.* at 2822). Regarding the prior partial credit issue, the arbitrator found the Fund "correctly applied the partial withdrawal credit as" part of the second adjustment under 29 U.S.C. § 1381(b)(1)(B).

---

[2] Prior to the 2019 Complete Withdrawal, the highest contribution rates that Kellanova paid to the fund were: $208.80 from June 15, 2014, through June 14, 2015; $217.20 from June 15, 2015, through June 14, 2016; $225.90 from June 15, 2016, through June 14, 2017; and $234.90 from June 15, 2017, through November 5, 2017. (Stipulation at 141).

Both parties disagreed with the arbitrator's decision and thus moved to modify in part and enforce in part the award. (*See* Central's Mot., Dkt. 22; Kellanova's Mot., Dkt. 24). Those motions are fully briefed.

**STANDARD OF REVIEW**

A party may seek judicial review to "enforce, vacate, or modify" an arbitrator's award in a withdrawal-liability arbitration. 29 U.S.C. § 1401(b)(2). An arbitrator's findings of fact are presumed correct, "rebuttable only by a clear preponderance of the evidence." 29 U.S.C. § 1401(c). An arbitrator's legal conclusions are reviewed de novo. *Trustees of Iron Workers Loc. 473 Pension Tr. v. Allied Prods. Corp.*, 872 F.2d 208, 211 (7th Cir. 1989).

**DISCUSSION**

"Multiemployer pension plans are based on defined contributions and pay defined benefits." *Ind. Elec. Workers Pension Ben. Fund v. ManWeb Servs.*, 884 F.3d 770, 775 (7th Cir. 2018). If one employer defaults on its contributions, whether by delinquency or withdrawal, other employers must make up the difference to cover the defined benefits owed to participants. *Upholsterers' Int'l Union Pension Fund v. Artistic Furniture of Pontiac*, 920 F.2d 1323, 1327-1328 (7th Cir. 1990) (citing *Central States, Se. & Sw. Areas Pension Fund v. Gerber Truck Serv. Inc.*, 870 F.2d 1148, 1151 (7th Cir. 1989)). Unpaid contributions also result in the loss of investment income that could have been earned by the plan. *Id.* at 1328. "Both types of losses put financial pressure on the remaining employers and discourage new employers from joining. The financial stability of the plan is put in jeopardy, and plan beneficiaries risk losing their pension benefits." *ManWeb*, 884 F.3d at 775.

"The MPPAA amended ERISA to protect multiemployer plans from these damaging consequences of withdrawal." *Id.* In enacting the MPPAA, Congress reflected "a desire to

(1) relieve the financial burden placed upon remaining contributors to a multiemployer fund when one or more of them withdraws from the plan; (2) avoid creating a severe disincentive to new employers entering the plan; and (3) prevent the creation of funding deficiencies." *Id.* at 775-776. Withdrawal liability is imposed on an employer that ends its participation in a multiemployer plan either completely or in part. *Id.* at 776. The House Committee on Education and Labor explained in enacting the MPPAA: "[e]mployer withdrawal liability will help to insulate a plan from the adverse effects of a sustained decline in the contribution base." *Id.* (quoting H.R. Rep. 96-689, Part 1, at 67, 1980 U.S.C.C.A.N. at 2395). The MPPAA creates an exit price to disincentivize employers from withdraw from multiemployer pension plans. *See, e.g., Milwaukee Brewery Workers' Pension Plan v. Joseph Schlitz Brewing Co.*, 513 U.S. 414, 416-417 (1995) (describing the potential for a "stampede for the exit doors" pre-MPPAA when employers perceived a pension plan to be on shaky financial ground).

Congress later enacted the PPA to increase funding levels for severely underfunded multiemployer pension plans. *See* 29 U.S.C. § 1085; *Lehman v. Nelson*, 862 F.3d 1203, 1207 (9th Cir. 2017). Depending on the funding level, the statute requires that the funds adopt a "funding improvement plan" or "rehabilitation plan" that includes "revised benefit structures" or "contribution structures" for employers to increase the plans' funding. 29 U.S.C. §§ 1085(a), (c)(1)(B), (e)(1)(B). "But by reducing plans' unfunded vested benefits through increased employer contribution rates, the Pension Protection Act paradoxically also increased employers' withdrawal liability payments (which are calculated using the employers' highest contribution rate)." *Cent. States, Se. & Sw. Areas Pension Fund v. Event Media, Inc.*, No. 1:22-CV-06133, 2024 WL 1363542, at *3 (N.D. Ill. Mar. 29, 2024), aff'd, 2025 WL 1185368 (7th Cir. Apr. 24, 2025). "Although Congress designed withdrawal liability payments to correspond with the employer's

share of unfunded vested benefits, *see Bay Area Laundry & Dry Cleaning Pension Trust Fund v. Ferbar Corp. of Cal., Inc.*, 522 U.S. 192, 196 (1997), employers' withdrawal liability payments went up as unfunded vested benefits went down under the Pension Protection Act's funding improvement and rehabilitation plans." 2024 WL 1363542, at *3. (citations omitted). The Multiemployer Pension Reform Act of 2014 addressed this by excluding some contribution rate increases from the withdrawal liability payment calculation. *Id.* (citing Methods for Computing Withdrawal Liability, Multiemployer Pension Reform Act of 2014, 86 Fed. Reg. 1256, 1264 (Jan. 8, 2021); 29 U.S.C. § 1085(g)).

Here, the parties specifically dispute: (1) how to calculate withdrawal liability payments under 29 U.S.C. § 1085(g); and (2) whether the prior partial credit—located in 29 U.S.C. § 1386(b)(1)—is applied during the second adjustment to UVB under 29 U.S.C. § 1381(b)(1)(B).

## I. <u>Withdrawal Liability Payments</u>

Section 1085(g) outlines the adjustments from funding improvement plans and rehabilitation plans that should be "disregarded in withdrawal liability determination." For contribution increases, "[i]n general":

> Any increase in the contribution rate (or other increase in contribution requirements unless due to increased levels of work, employment, or periods for which compensation is provided) that is required or made in order to enable the plan to meet the requirement of the funding improvement plan or rehabilitation plan shall be disregarded in determining the allocation of unfunded vested benefits to an employer under section 1391 of this title and in determining the highest contribution rate under section 1399(c) of this title . . . .

29 U.S.C. § 1085(g)(3)(A). This general rule is qualified by "special rules":

> For purposes of this paragraph, any increase in the contribution rate (or other increase in contribution requirements) shall be deemed to be required or made in order to enable the plan to meet the requirement of the funding improvement plan or rehabilitation plan except for increases in contribution requirements due to increased levels of work, employment, or periods for which compensation is provided or additional contributions are used to provide an increase in benefits, including an increase in future benefit accruals, permitted by subsection (d)(1)(B) or (f)(1)(B).

29 U.S.C. § 1085(g)(3)(B). In other words, the statute's general rule is that "*any* increase in the contribution rate . . . that is required or made in order to enable to meet the requirement of the funding improvement plan or rehabilitation plan shall be disregarded" when calculating the highest contribution rate. 29 U.S.C. § 1085(g)(3)(A) (emphasis added). And the statute's special rules go on to clarify that "'any increase in the contribution rate . . . *shall be deemed* to be required or made in order to enable the plan to meet the requirement of the funding improvement plan or rehabilitation,' with two exceptions." *Event Media*, 2024 WL 1363542, at *3 (quoting 29 U.S.C. § 1085(g)(3)(B)) (emphasis added).

The first exception is "for increases in contribution requirements due to increased levels of work, employment, or periods for which compensation is provided." 29 U.S.C. § 1085(g)(3)(B). The second exception is for "additional contributions . . . used to provide an increase in benefits, including an increase in future benefit accruals, permitted by subsection (d)(1)(B) or (f)(1)(B)." *Id.* Subsection (d)(1)(B) applies to funds with "funding-improvement plans," and subsection (f)(1)(B) applies to funds with "rehabilitation plans." 29 U.S.C. §§ 1085(d)(1)(B), (f)(1)(B). Because the Fund here adopted a rehabilitation plan, (Stipulation, at 140), not a funding-improvement plan, subsection (f)(1)(B) is the only relevant exception.

Subsection (f)(1)(B) provides:

> A plan may not be amended after the date of the adoption of a rehabilitation plan under subsection (e) so as to increase benefits, including future benefit accruals, unless the plan actuary certifies that such increase is paid for out of additional contributions not contemplated by the rehabilitation plan, and, after taking into account the benefit increase, the multiemployer plan still is reasonably expected to emerge from critical status by the end of the rehabilitation period on the schedule contemplated in the rehabilitation plan.

29 U.S.C. § 1085(f)(1)(B). "In other words, subsection (f)(1)(B) permits a plan to be amended to increase benefits only if 'the plan actuary certifies' certain facts about the increase." *Royal Ice*

*Cream Co. v. Cent. States, Se. & Sw. Areas Pension Fund*, 732 F. Supp. 3d 888, 891 (N.D. Ill. 2024) (quoting 29 U.S.C. § 1085(f)(1)(B)).

The Fund does not contend that the post-2014 rate increases at issue in this case were certified by an actuary to meet the requirements of subsection (f)(1)(B). Rather, the Fund argues that because 29 U.S.C. § 1085 (f)(1)(B) prohibits "a benefit/benefit accrual increase pursuant to a rehabilitation plan amendment that is not accompanied by the required actuarial certification," it permits "all other types of benefit/benefit accrual increases." (Fund's Opp'n, at 2933, Dkt. 30). But, as another judge in this district succinctly said, "this is simply an incorrect interpretation of (f)(1)(B)." *Royal Ice Cream*, 732 F. Supp. 3d at 891. That provision prohibits all benefit increases except for those certified by a plan actuary.

In sum, as the Seventh Circuit recently held in the same exact scenario, the Fund's interpretation ignores the applicable language of section 1085. *See Cent. States, Se. & Sw. Areas Pension Fund v. Event Media, Inc.*, No. 24-1739, 2025 WL 1185368, at *4 (7th Cir. Apr. 24, 2025). As applied to Kellanova's withdrawal liability payments, the statute instructs that any and all increases in the contribution rate made in order to meet a rehabilitation plan should be "disregarded" unless permitted by section 1085(f)(1)(B). 29 U.S.C. §§ 1085(g)(3)(A)-(B). Subsection (f)(1)(B) only permits a plan to be amended to increase benefits if the plan actuary certifies certain criteria about the increase. 29 U.S.C. § 1085(f)(1)(B). Because the Fund does not contend that any increases here were certified by an actuary, any post-2014 rate increases should be disregarded when calculating Kellanova's withdrawal liability. *Accord Royal Ice Cream*, 732 F. Supp. 3d at 892 (Durkin, J.) (finding that post-2014 rate increases should not be used to calculate an employer's withdrawal liability under the same circumstances); *Event Media, Inc.*, 2024 WL 1363542, at *5 (Chang, J.) (same); *Cent. States, Se. & Sw. Areas Pension Fund v.*

*McKesson Corp.*, No. 23 CV 16770, 2025 WL 81358, at *5 (N.D. Ill. Jan. 13, 2025) (Shah, J.) (same). All of Kellanova's post-2014 contribution rate increases are excluded from the withdrawal liability calculation. The Court therefore enforces the arbitrator's decision on this issue.

## II. Prior Partial Credit

Under the MPPAA, withdrawal liability is either "partial," *i.e.*, imposed when "the employer permanently ceases to have an obligation to contribute under one or more but fewer than all collective bargaining agreements under which the employer has been obligated to contribute under the plan," or "complete," *i.e.*, imposed when the employer "permanently ceases to have an obligation to contribute under the plan." 29 U.S.C. §§ 1383(a)(1), 1385(b)(2)(A)(i). The MPPAA contains a "detailed set of rules for determining" the withdrawal liability charge. *Milwaukee Brewery*, 513 U.S. at 417-418. "If an employer withdraws from a multiemployer plan in a complete withdrawal or a partial withdrawal, then the employer is liable to the plan in the amount determined under [section 1381] to be the withdrawal liability." 29 U.S.C. § 1381(a).

When calculating withdrawal liability—whether complete or partial—section 1381(b)(1) states to first calculate "the amount determined under section 1391 of this title to be the allocable amount of unfunded vested benefits [or the 'UVB']." 29 U.S.C. § 1381(b)(1). Then a series of four adjustments to the UVB must be made, if applicable:

> (A) first, by any de minimis reduction applicable under section 1389 of this title,
>
> (B) next, in the case of a partial withdrawal, in accordance with section 1386 of this title,
>
> (C) then, to the extent necessary to reflect the limitation on annual payments under section 1399(c)(1)(B) of this title, and
>
> (D) finally, in accordance with section 1405 of this title.

29 U.S.C. §§ 1381(b)(1)(A)-(D). After the four adjustments are complete, the resulting amount is an employer's withdrawal liability for a given plan year. In sum, the total withdrawal liability an employer must pay for a partial or complete withdrawal from a multiemployer plan is equal to the sum of the UVB, and the four adjustments enumerated in section 1381(b)(1)(A)-(D).

The parties contest whether the arbitrator correctly applied the second adjustment under section 1381(b)(1)(B). Kellanova argues that the arbitrator erred by applying the 2012 Partial Withdrawal as part of the second adjustment rather than as a post-adjustment credit to the 2019 Complete Withdrawal. (*See* Kellanova's Mot., at 2907-2913). In contrast, the Fund says the arbitrator is correct because the plain language of the statute requires applying the credit for the 2012 Partial Withdrawal as part of the second adjustment. (*See* Fund's Mot., at 2842-2843).

As this Court recently found in *Consumers Concrete Corp. v. Cent. States, Se. & Sw. Areas Pension Fund*, "the prior partial credit must be applied after the four adjustments of section 1381(b)(1)." No. 23 C 2695, 2025 WL 1001799, at *4 (N.D. Ill. Apr. 3, 2025) (Hunt, J.). In that case, the parties disagreed on whether the arbitrator correctly applied the prior partial credit during the second adjustment. *Id.* This Court held, among other things, that: (1) read "holistically," sections 1381 and 1386 "demonstrate that the Second Adjustment does not include the prior partial credit specified in section 1386(b)(1)"; (2) the UVB "does not constitute withdrawal liability until the four adjustments in section 1381(b)(1)(A)-(D) are applied"; and (3) "the MPPAA necessitates the prior partial credit is not part of the Second Adjustment and must be applied after the four adjustments outlined in section 1381(b)(1)(A)-(D)." *Id.* at *4-5.

The Court sees no reason to deviate from its *Consumers Concrete* opinion here. Consistent with that opinion and order, the Court finds that the Fund (and the arbitrator) erred by applying the prior partial credit for Kellanova's 2012 Partial Withdrawal at the second adjustment under section

1381(b)(1)(B). The prior partial credit must be applied after the four adjustments outlined in section 1381(b)(1)(A)-(D).

**CONCLUSION**

For the reasons discussed above, the Fund's motion to enforce the arbitration award in part and modify the arbitration award in part is denied. Kellanova's motion to enforce the arbitration award in part and modify the arbitration award in part is granted. The Court therefore enforces the arbitration award such that Kellanova's withdrawal liability payments must be calculated based on the highest contribution rate of $208.80 that was in effect prior to January 1, 2015, the Fund must return any excess contributions paid by Kellanova with interest, and the Fund must pay Kellanova one-half of the $5,000 filing fee ($2,500), paid to initiate Case No. 01-20-0005-3021.[3] Furthermore, the Court modifies the arbitration award to reflect that when calculating Kellanova's withdrawal liability for the 2019 Complete Withdrawal, the Fund must apply the prior partial credit under 29 U.S.C. § 1386(b)(1) after the four adjustments in 29 U.S.C. §§ 1381(b)(1)(A)-(D).

**DATED**: May 5, 2025

**ENTERED**:

LaShonda A Hunt

LASHONDA A. HUNT
United States District Judge

[3] The arbitrator notified the parties after he issued the award that, under the arbitration rules and 29 C.F.R. § 4221.10, "the cost of the arbitration shall be borne equally by the parties. We confirm [Kellanova] paid a $5,000 filing fee. Therefore, [the Fund] shall pay [Kellanova] the sum of [$2,500.00]." (*See* Compl., Ex. B, at 28, Dkt. 1-2) (arbitrator affirming that as a result of the arbitration proceeding, the Fund is required to pay Kellanova one-half of the $5,000 filing fee).